1
2
3
4
5
6
7
8
9
10

**IN THE UNITED STATES DISTRICT COURT**

11

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

12
13

SMITH BARNEY,                                          CASE NO. CV F 08-0373 LJO GSA

14

              Plaintiff,                    **ORDER ON MOTION FOR PRELIMINARY INJUNCTION**

15

   vs.                                                        (Doc. 29.)

16

JEFF BURROW, et al,

17

              Defendants.

                               /

18
19

**INTRODUCTION**

20

      Plaintiff Smith Barney seeks to prohibit permanently defendants Jason Gordo ("Mr. Gordo"),

21

Jeff Burrow ("Mr. Burrow"), and Valley Wealth, Incorporated ("Valley Wealth")[1] to solicit Smith

22

Barney clients and to use or destroy information which financial advisors Mr. Burrow and Mr. Gordo

23

acquired during their Smith Barney employment and which Smith Barney characterizes as its trade

24

secrets.  Smith Barney also seeks return from Mr. Burrow and Mr. Gordo of all documents and records

25

containing Smith Barney trade secrets.  Defendants contend that they have acted "lawfully and properly"

26

and have returned to Smith Barney all materials required by this Court's prior orders to warrant denial

27
28

    [1]    Mr. Burrow, Mr. Gordo and Valley Wealth will be referred to collectively as "defendants."

1

of a preliminary injunction.  Defendants claim that they are entitled to access to information about their clients and which defendants have collected and maintained for the clients for many years.  This Court considered Smith Barney's preliminary injunction motion on the record[2] and without a hearing, pursuant to this Court's Local Rule 78-230(h).  For the reasons discussed below, this Court PROHIBITS defendants, up to March 7, 2009, to solicit clients who were brought to Smith Barney or were serviced primarily at Smith Barney by other financial advisors.  This Court DENIES Smith Barney further injunctive relief and VACATES its prior temporary restraining orders.

## BACKGROUND

### Mr. Burrow And Mr. Gordo's Smith Barney Employment

Smith Barney is a division of Citigroup Global Markets Inc. and provides financial services, including purchase and sale of investment products.  Smith Barney employed Mr. Gordo and Mr. Burrow as financial advisors in its Modesto branch.  Mr. Gordo started his securities career with Smith Barney on May 11, 2001, and Mr. Burrow, a seasoned financial advisor, started his Smith Barney employment on February 18, 2005 after he was recruited from then Dean Witter Reynolds, Inc. (now Morgan Stanley).  On March 7, 2008, Mr. Gordo and Mr. Burrow resigned from Smith Barney and started conducting their business under Valley Wealth, which had been incorporated on September 28, 2007 and had received Securities Exchange Commission ("SEC") approval as an investment advisor on February 28, 2008.

### Confidentiality And Non-Solicitation Agreements

Mr. Gordo and Mr. Burrow signed several employment agreements to acknowledge that Smith Barney's client information was confidential and to agree to an injunction to prevent unauthorized use of such information.[3]  In 2001, Mr. Gordo signed a Financial Consultant Trainee Employment Agreement and Restrictive Covenants ("Trainee Agreement") which provides in pertinent part:

---

[2]     This Court carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, objections and other papers filed by the parties.  Omission of reference to an argument, document, paper or objection is not to be construed to the effect that this Court did not consider the argument, document, paper or objection.  This Court thoroughly reviewed and considered the evidence it deemed material and appropriate for this Court's ruling.

[3]     Mr. Gordo and Mr. Burrow acknowledge that they signed "various agreements" which "included clauses dealing with proprietary and confidential client information and non-solicitation provisions and non-compete provisions."

2

<u>All records</u>, whether original, duplicated, computerized, memorized, handwritten, or in any other form, <u>and all information</u> contained therein, including names, address, phone numbers and financial information of any account, customer, client, customer lead or prospect ("Account"), are **confidential** and are the **sole and exclusive property** of Salomon Smith Barney.  This information, whether provided to me by Salomon Smith Barney or by any Account, is **entrusted** to me as an **employee and sales representative** of Salomon Smith Barney.  I will not use this information or remove any such records from the Salomon Smith Barney office except for the **sole purpose of conducting business on behalf of Salomon Smith Barney**.  I agree **not to divulge or disclose this information to any competitor** of Salomon Smith Barney either during my employment or any time thereafter.

This information is extremely valuable to Salomon Smith Barney and Salomon Smith Barney takes all reasonable measures to maintain its confidentiality and to guard its secrecy.  This information is not generally known outside Salomon Smith Barney and within Salomon Smith Barney is confidential and **used only on a "need to know" basis**.  This information is developed and acquired by great expenditures of time, effort and money.  This information is unique and cannot be easily duplicated or acquired.  Consequently, **I agree** that these records and the information contained therein are the **property of Salomon Smith Barney** and are **deserving of trade secret status** and protection.  (Underlining in original; bold added.)

The Trainee Agreement includes a non-solicitation clause:

If, at any time, I **resign** from Salomon Smith Barney . . . **I agree that for a period of one year following my termination I will not solicit** by mail, by phone, by personal meeting, or by any other means, either directly or indirectly, any Account whom I served or whose name became known to me during my employment at Salomon Smith Barney in any office and in any capacity.  My agreement "not to solicit" means that I **will not**, during my employment and for a period of one year thereafter, **initiate any contact or communication, of any kind whatsoever, for the purpose of inviting, encouraging or requesting any Account**:

(a) to transfer from Salomon Smith Barney to me or to my new employer, or

(b) to open a new account with me or with my new employer, or

(c) to otherwise discontinue his patronage and business relationship with Salomon Smith Barney.

In a November 29, 2001 Account Referral/Assigned Lead Agreement, Mr. Gordo acknowledged confidentiality of client information obtained through Smith Barney accounts and agreed to a covenant not to solicit that during his employment and one year after his departure, he would "not solicit by mail, by phone, by personal meeting, or by any other means" any customers assigned to him or brought into Smith Barney by another financial advisor.  Mr. Gordo consented to a temporary restraining order or injunction for breach of the covenant not to solicit.

Mr. Gordo signed an October 28, 2002 Joint Production Agreement which contained a covenant

3

not to solicit by which Mr. Gordo agreed for year following his termination that he "will not solicit by mail, by telephone, by personal meeting, or by any other means, either directly or indirectly, any account/household or Plan Account **brought or introduced to the Joint Number by the other Producer**." (Bold added.) The covenant not to solicit provides that "the Producer will not, during their employment and for a period of one year thereafter, initiate any contact of communication, of any kind whatsoever for the purpose of inviting, encouraging or requesting such account, account/household or Plan Account" to transfer from Smith Barney, open a new account elsewhere or otherwise discontinue "patronage and business relationship with SB or the other Producer."

Mr. Burrow signed a July 25, 2005 Joint Production Agreement which Mr. Burrow claims was entered into "to run a unique investment portfolio for those clients I introduced to the partnership." The Joint Production Agreement contained a covenant not to solicit whereby Mr. Burrow agreed for year following his termination that he "will not solicit by mail, by telephone, by personal meeting, or by any other means, either directly or indirectly, any account/household or Plan Account **brought or introduced to the Joint Number by the other Producer**." (Bold added.) The covenant not to solicit provides that "the Producer will not, during their employment and for a period of one year thereafter, initiate any contact of communication, of any kind whatsoever for the purpose of inviting, encouraging or requesting such account, account/household or Plan Account" to transfer from Smith Barney, open a new account elsewhere or otherwise discontinue "patronage and business relationship with SB or the other Producer."

The Joint Producer Agreements address confidential information: "The Producers recognize and agree that all records . . . and information contained herein, including names, addresses, telephone numbers, and financial information ("information") of any account/household or Plan Account brought to the Joint Number by the other Producer . . . is confidential and the sole and exclusive property of SB and that other Producer."

Smith Barney notes that pursuant to the Joint Production Agreements, Mr. Gordo and Mr. Burrow received access to Smith Barney clients and were eligible to receive referrals from other financial advisors, including Carl Rice ("Mr. Rice"). Smith Barney claims that: (1) Mr. Rice had generated significant corporate and other client relationships and opportunities for Mr. Gordo and Mr.

4

Burrow; and (2) Smith Barney would not have agreed to give Mr. Gordo and Mr. Burrow access to Mr.

Rice's clients if Mr. Gordo and Mr. Burrow had not agreed to confidentiality and non-solicitation

provisions.

In August 2005, Mr. Burrow and Mr. Gordo decided to become partners and combine their books

of business. They also partnered with Mr. Rice, who had indicated he planned to retire and to transfer

his clients.[4] In their August 26, 2005 Team Agreement For Financial Consultants ("Team Agreement"),

Mr. Gordo and Mr. Burrow agreed to a covenant not to solicit that during their employment and one year

after their departure, they would "not solicit by mail, by telephone, by personal meeting, or by any other

means" any customers brought to Smith Barney by another financial advisor. Pursuant to the Team

Agreement, Mr. Gordo and Mr. Burrow consented to injunctive relief:

> The FC [Financial Consultant] recognizes that [Smith Barney] will suffer immediate and
> irreparable harm and that money damages will not be adequate to compensate [Smith
> Barney] or to protect and preserve the status quo. Therefore, such FC consents to the
> issuance of a Temporary Restraining Order or a Preliminary or Permanent Injunction .
> . .

The Team Agreement provides that such injunctive relief includes immediate return to Smith Barney

of all account information and entry of a one-year non-solicitation restraining order.

Mr. Gordo and Mr. Burrow also agreed to comply with policies in Smith Barney's employee

handbook. Such policies include non-solicitation of clients:

> During the one year following the separation of your employment from [Smith Barney],
> you agree that you will not solicit, either directly or indirectly, individually or in concert
> with a third party, any client or customer of [Smith Barney] or its affiliates, whose
> account(s) you served or whose name you learned during your association with [Smith
> Barney].

Furthermore, Mr. Gordo and Mr. Burrow signed January 2008 computer agreements that: (1)

information, data and files related to or used in connection with their employment and which are created,

received, downloaded, stored, transmitted, deleted or used on any personal or non-network computer are

Smith Barney's property; and (2) upon Mr. Gordo and Mr. Burrow's resignation, Smith Barney may

physically inspect in Mr. Gordo and Mr. Burrow's presence, and if deemed necessary, may take

temporary possession of non-network computers and remove, erase or delete business-related

---

[4]    By the end of 2006, Mr. Rice decided not to participate in a partnership with Mr. Burrow and Mr. Gordo
and worked solo.

1 information or data.

2 **Valley Wealth Activity**

3 Defendants note that in 2007, Mr. Burrow and Mr. Gordo "decided they wanted to jointly pursue

4 their individual goals of running their own business as wealth advisors" and incorporated Valley Wealth

5 on September 28, 2007.  Valley Wealth applied for registration with the SEC on February 7, 2008 and

6 received SEC's registered investment advisor approval on February 28, 2008.  Also on February 28,

7 2008, Valley Wealth filed a California notice to register as an investment advisor.

8 Smith Barney claims that months prior to their resignation, Mr. Gordo and Mr. Burrow compiled

9 "Comprehensive Account Review Notebooks" ("notebooks") relating to their Smith Barney clients and

10 which included Smith Barney statements, portfolio minder performance reports, investment policy

11 statements, financial plans prepared on Smith Barney systems, and estate-related documents.  Smith

12 Barney alleges that the notebooks were compiled on Smith Barney time and money and that Mr. Gordo

13 and Mr. Burrow used Smith Barney interns to copy and to print confidential client information used in

14 the notebooks, to organize and to compile information into the notebooks, and to address envelopes to

15 Smith Barney clients.  Smith Barney accuses Mr. Gordo and Mr. Burrow of taking the notebooks when

16 they resigned with apparent intent to solicit Smith Barney clients.

17 Mr. Gordo and Mr. Burrow deny that they took the notebooks on their departure in that the

18 notebooks were prepared and mailed or hand-delivered to clients.  Mr. Gordo and Mr. Burrow claim that

19 they discussed the notebooks with Smith Barney Modesto branch manager Marc Glass ("Mr. Glass"),[5]

20 who approved the idea of the notebooks.

21 Smith Barney contends that on February 8, 2008, Mr. Gordo and Mr. Burrow approached Smith

22 Barney management regarding materials on Smith Barney's investment philosophy.  Smith Barney

23 presumed Mr. Gordo and Mr. Burrow intended to use the materials for client meetings as Smith Barney

24 employees.  Smith Barney provided the materials and noted the philosophy was "not a script," was "for

25 internal use only," and that Mr. Gordo and Mr. Burrow could "take what [they] like and leave the rest."

26 Smith Barney accuses Mr. Gordo and Mr. Burrow of copying the materials verbatim and using them on

27

28 [5] Mr. Glass was Mr. Gordo and Mr. Burrow's direct supervisor.

1 the Valley Wealth website immediately after their resignation.

2 **Mr. Gordo And Mr. Burrow's Resignations**

3     On March 7, 2008, Mr. Gordo and Mr. Burrow resigned from Smith Barney and began working

4 for Valley Wealth.  Building records for the Smith Barney Modesto branch reveal that Mr. Burrow's car

5 entered the parking garage at 10:30 p.m. on March 6, 2008.  According to building records, Mr. Gordo

6 and Mr. Burrow made multiple entries into the Smith Barney branch by a back stairwell from 10:34 p.m.

7 on March 6, 2008 to 12:09 a.m. on March 7, 2008.[6]  Prior to their March  7, 2008 resignations, Mr.

8 Gordo and Mr. Burrow were seen leaving the Smith Barney office with a number of boxes which Smith

9 Barney surmises contained the notebooks and other potential client information. Mr. Gordo and Mr.

10 Burrow claim the boxes contained "a lot of personal items"[7] and deny they departed "with boxes of

11 information containing anything belonging to clients and/or Smith Barney." Mr. Gordo and Mr. Burrow

12 chose to move the items at night "because, based on our observations, we knew we would not be allowed

13 access to our offices once we tendered our resignations."  Despite Mr. Gordo and Mr. Burrow's claims,

14 Smith Barney surmises that Mr. Gordo and Mr. Burrow took more than personal effects in that clients

15 have informed Smith Barney to note that they had received copies of notebooks and had been solicited

16 by Mr. Gordo and Mr. Burrow before and immediately after their resignations.

17     After their resignations, Mr. Gordo and Mr. Burrow sent e-mail announcements to their clients

18 noting the start up of Valley Wealth.  Mr. Gordo and Mr. Burrow note that "many individuals initiated

19 contact" with them "by calling or coming to Valley Wealth, Inc., stated that they wanted to transfer their

20 accounts to Valley Wealth, Inc., and requested the paperwork necessary to do so."

21     In their respective March 21, 2008 affidavits, Mr. Gordo and Mr. Burrow deny that they, prior

22 to their March 7, 2008 resignations: (1) conducted business under Valley Wealth; (2)informed clients

23 about Valley Wealth and solicited business; and (3) set up client meetings to occur on or after March

24

---

25     [6]    Smith Barney notes that Mr. Burrow made multiple entries into the Modesto branch during the evening of

26 Sunday, March 2, 2008.

27     [7]    In their May 8, 2008 affidavits, Mr. Gordo and Mr. Burrow identify the personal items to include books, DVDs, practice management files, training manuals, personal papers, office supplies, office-size refrigerator, cookie oven,

28 dough and tins, furniture, stereo system, coffee system and cups, office trees and plants, pieces of art, and framed photographs.

7, 2008.  In their respective May 8, 2008 affidavits, Mr. Gordo and Mr. Burrow deny soliciting "Smith Barney clients while at Smith Barney or after my resignation.  As with all of our clients who have transferred their accounts from Smith Barney, that decision was made by the client(s) without any solicitation. . . . We provided transfer paperwork only to those clients who requested it."

Mr. Gordo and Mr. Burrow claim that they compiled notebooks "for certain clients to use in order to better organize their financial lives.  All Binders were either provided (prior to March 7, 2008) to clients in person or by US Mail."  Mr. Gordo and Mr. Burrow note that the letter that accompanied the notebooks "made no reference to Valley Wealth, Inc.  It also was not on Smith Barney letterhead, rather it was typed on a plain piece of paper."[8]  Mr. Gordo and Mr. Burrow deny that they: (1) "asked Smith Barney Management or anyone else for a copy of their Investment Philosophy"; and (2) made "a practice of maintaining highly sensitive personal client information (such as social security numbers, etc.) on my computer."

Mr. Gordo had serviced 134 households with Smith Barney accounts holding assets exceeding $35 million.  Mr. Gordo's commissions for 12 months ending February 2008 were $445,542.  Mr. Burrow serviced 136 households with accounts holding assets nearing $35 million.  Mr. Burrow's commissions for 12 months ending February 2008 approximated $395,000.  Since working at Smith Barney, Mr. Gordo and Mr. Burrow note that they had expended $125,000 and $122,000, respectively, of their personal money on business and marketing expenses to develop and maintain his "book of business."

**Protocol For Broker Recruitment**

To defend their Valley Wealth start up, Mr. Gordo and Mr. Burrow rely on the Protocol For Broker Recruiting ("Protocol"), which they describe as an "industry standard collective bargaining agreement" to govern "financial firms in dealing with the modern trends of financial advisors who change financial firms and bring with them their clients."  Defendants point out that in 2004, three of the most powerful brokerage firms, including Smith Barney, signed the Protocol.

---

[8]     The accompanying letter states: "This binder is one of the most important tools we can use to help organize your financial life.  Keep this somewhere safe and secure.  There are many benefits this 'Wealth Binder' will bring you, and we will help you implement it to its fullest potential.  Also, it is important that you bring this to your next meeting."

The Protocol provides:

The principal goal of the following protocol is to further the clients' interests of privacy and freedom of choice in connection with the movement of their Registered Representatives ("RRs") between firms. If departing RRs and their new firm follow this protocol, neither the departing RR nor the firm that he or she joins would have any monetary or other liability to the firm that the RR left by reason of the RR taking the information identified below or the solicitation of the clients serviced by the RR at his or her prior firm, provided, however, that this protocol does not bar or otherwise affect the ability of the prior firm to bring an action against the new firm for "trading." . . .

When RRs move from one firm to another and both firms are signatories to this protocol, they may take only the following account information[:] client name, address, phone number, email address, and account title of the clients that they serviced while at the firm ("the Client Information") and are prohibited from taking any other documents or information. Resignations will be in writing delivered to local branch management and shall include a copy of the Client Information that the RR is taking with him or her. The RR list delivered to the branch must also include the account numbers for the clients serviced by the RR.

. . .

RRs that comply with this protocol would be free to solicit customers that they serviced while at their former firms, but only after they have joined their new firms. A firm would continue to be free to enforce whatever contractual, statutory or common law restrictions exist on the solicitation of customers to move their accounts by a departing RR before he or she has left the firm.

On March 7, 2008, Valley Wealth signed a Joinder Agreement to the Protocol for Broker Recruiting ("joinder agreement"). On March 17, 2008, defense counsel sent Valley Wealth's joinder agreement to the attorney who administers new Protocol admittees. On March 18, 2008,[9] an e-mail was sent to Protocol members, including Smith Barney, to announce that Valley Wealth was a Protocol member. Valley Wealth claims it would have joined the Protocol on March 7, 2008 if information was publicly available on how to join, whom to contact to join, and how to obtain a Protocol copy. Smith Barney claims that Mr. Gordo and Mr. Burrow failed to provide Smith Barney the client information required by the Protocol and took more than client information, including entire client files, client enrollment kits, and marketing materials. In his declaration, Mr. Glass states that Mr. Gordo and Mr. Burrow neither sought nor obtained Mr. Glass' approval to send out the notebooks with letters to clients. Mr. Glass further declares that Mr. Gordo and Mr. Burrow provided him only one-page resignations letters and have "never provided Smith Barney with any 'Client Information' for clients they hoped to

---

[9]   Smith Barney notes that two business days earlier, it had notified defendants that it would seek the TRO.

solicit after their resignation."  Mr. Gordo and Mr. Burrow counter that "upon our resignation, we emailed from our branch email address a copy of the client contact information we intended to take."

**Temporary Restraining Order**

On Smith Barney's ex parte request, this Court issued a March 18, 2008 Amended Temporary Restraining Order ("TRO") to enjoin defendants from:

 1. Disposing of, destroying or altering Smith Barney's trade secrets, including information relating or pertaining to Smith Barney's current and former clients;

 2. Soliciting or accepting business from a Smith Barney client or customer whom defendants served or whose names became known to defendants while employed with Smith Barney; and

 3. Accepting business or account transfers from customers whose records or information defendants used to violate their contractual and trade secret obligations to Smith Barney.

The TRO requires defendants to return to Smith Barney documents and records containing Smith Barney's trade secrets and confidential client information and to provide defendants' personal computers for inspection and removal of Smith Barney's trade secrets, confidential client information and property.

This Court's March 24, 2008 order denied defendants' request to vacate/dissolve the TRO.

On March 25, 2008, defendants produced to Smith Barney what Smith Barney characterizes as an inventory of 37 items of its "property and confidential information," including:

 1. Four compete files of existing Smith Barney clients;

 2. Two complete files of prospective Smith Barney clients;

 3. Multiple partial files of existing Smith Barney clients;

 4. Smith Barney internal practice management and marketing kits;

 5. Multiple clients' account statements;

 6. Client notebooks allegedly returned to defendants in the days following Mr. Gordo and Mr. Burrow's resignations; and

 7. "Enrollment kits" which identified the investment holdings and strategies of the two largest clients of Smith Barney's Modesto branch.

Defendants also provided a client information list which included clients serviced by Mr. Gordo, Mr.

1   Burrow and other Smith Barney representatives.

2         In their May 8, 2008 affidavits, Mr. Gordo and Mr. Burrow respectively aver: "I did not, at any

3   time, intentionally take Smith Barney confidential or trade secret information."  In their affidavits, Mr.

4   Gordo and Mr. Burrow outline their searches to comply with the TRO and itemize 36 categories of

5   materials which they provided to Smith Barney.  The categorized materials include prospect files,

6   handwritten notes, financial, annuity and retirement records of clients, including Mr. Gordo and Mr.

7   Burrow's relatives and friends, and four client notebooks received March 10-13, 2008.  Defendants

8   characterize most of the turned over materials as not "under the parameters of the TRO" but were turned

9   over "in an abundance of caution."

10                          **Alleged Continuing Solicitation**

11        Mr. Glass declares that "at least 15 clients report to us that they have been unlawfully solicited

12  by Defendants."  Mr. Glass notes that clients reported receiving notebooks and account transfer packets

13  within a few days of Mr. Gordo and Mr. Burrow's resignations although the clients had not requested

14  the notebooks and account transfer packets.  According to Mr. Glass, clients reported that they had

15  received telephone calls from Mr. Gordo and Mr. Burrow that they had changed firms and that the

16  clients should submit account transfer paperwork.  Mr. Glass points out that a client represented that the

17  solicitations influenced her to discontinue her relationship with Smith Barney.

18                      **Mr. Gordo And Mr. Burrow's Laptop Computers**

19        On March 16, 2008, Mr. Burrow moved personal financial information and Valley Wealth

20  business information from his laptop computer to a USB thumb drive.[10]  On March 20, 2008, Joseph

21  Steely ("Mr. Steely"), Valley Wealth's Information Technology ("IT") person, ran, in Mr. Burrow's

22  words, "a software program to wipe the free space on the hard drives so that nobody could pull up files

23  that were not their property."

24        Smith Barney retained SafirRosetti to inspect Mr. Gordo and Mr. Burrow's laptop computers.

25  According to SafirRosetti, less than 24 hours after they received the TRO, Mr. Gordo and Mr. Burrow

26  ran scrubbing software to delete 50,000 files from their laptop computers.  SarfirRosetti determined that

27

28        [10]        USB thumb drives are used to load files onto a computer or to transfer files from a computer.

before running the file deletion software, Mr. Gordo and Mr. Burrow apparently used USB drives to copy information from their laptop computers to the USB drives.  Smith Barney notes that defendants have not provided Smith Barney with USB drives or other computer disks, drives or devices that contain copies of the files.

Defense counsel retained Chris Kautzman ("Mr. Kautzman"), a senior systems engineer for a business computer technology consulting firm, to inspect Mr. Gordo and Mr. Burrow's laptops and USB thumb drives and Valley Wealth's network server and three workstations.  In his May 8, 2008 affidavit, Mr. Kautzman avers that "[n]o information relating to Smith Barney was found on the Valley Wealth, Inc. systems."  Mr. Kautzman further states: "I have examined the files on Jeff Burrow's thumb drive, including files that were moved from a laptop to the thumb drive on March 16, 2008; all of the files on Jeff Burrow's thumb drive are files of a personal nature, including personal financial information, or Valley Wealth business information, including business plan, company financials, budgets; there were no Smith Barney files or information on Mr. Burrow's thumb drive. . . . The files contained on Mr. Burrow's thumb drive are consistent with and could account for the 'deleted files' . . ."

### Operative TRO

Based on the parties' stipulation, this Court issued an April 18, 2008 amended TRO ("April 18 TRO") to enjoin defendants and their agents from: (1) "disposing of, destroying or altering in any way Smith Barney's Trade Secrets, including, specifically, information relating or pertaining to Smith Barney's current and former clients that are in their possession or control"; or (2) "soliciting any client or customer of Plaintiff whom Jeffrey Burrow or Jason Gordo served or whose name or identity became know to Jeffrey Burrow or Jason Gordo while employed at Plaintiff (excluding members of Defendants' immediate family)."

### DISCUSSION

### Preliminary Injunction Standards

Smith Barney seeks a preliminary injunction to prohibit defendants to solicit Smith Barney clients and to require defendants to return Smith Barney's confidential client information.  To obtain a preliminary injunction, a moving party must establish:

1.	The moving party will suffer irreparable injury if the injunctive relief is not granted;

12

2.      The moving party will probably prevail on the merits;

3.      In balancing the equities, the non-moving party will not be harmed more than the moving

party is helped by the injunction; and

4.      Granting the injunction is in the public interest.

*Stanley v. University of So. Cal.*, 13 F.3d 1313, 1319 (9th Cir. 1994); *Martin v. International Olympic Committee*, 740 F.2d 670, 674-675 (9th Cir. 1984).[11]

### **Success On Merits**

### *Breach Of Employment Agreements*

_____Smith Barney contends it will prevail on the merits given that Mr. Gordo and Mr. Burrow signed agreements not to solicit Smith Barney clients and to acknowledge that customer information was Smith Barney's confidential property.  Smith Barney points to the absence of dispute that Mr. Gordo and Mr. Burrow consented to a preliminary injunction in their employment agreements.

Defendants contend that they have violated neither the Joint Production Agreements nor Team Agreement in that defendants "are permitted to solicit their own clients under those agreements." Defendants point out that covenants not to solicit in the Joint Production Agreements prohibit Mr. Gordo and Mr. Burrow to solicit "any account/household or Plan Account brought to the Joint Number by the other Producer."  The covenants not to solicit further provide:

This agreement "not to solicit" means that the Producer will not during their employment and for a period of one year thereafter, initiate any contact or communication, of any kind whatsoever, for the purpose of inviting, encouraging or requesting any such account[,] account/household or Plan Account:

(a) to transfer from SSB to them or their new employer; or

(b) to open a new account with them or with their new employer, or

(c) to otherwise discontinue such account's/household's or Plan Account's patronage and business relationship with SSB or the other Producer.

The covenants not to solicit in the Joint Production Agreements address accounts brought by producers other than Mr. Gordo and Mr. Burrow.  The covenant is silent as to accounts brought by Mr.

---

[11]      "Alternatively, a court may issue a preliminary injunction if the moving party demonstrates *either* a combination of probable success on the merits and the possibility of irreparable injury *or* that serious questions are raised and the balance of hardships tips sharply in his favor."  *Martin*, 740 F.2d at 674-675.  Smith Barney applies the four above factors to seek a preliminary injunction, and this Court will address them in the order raised by Smith Barney.

1   Gordo and Mr. Burrow as producers.

2      Turning to the August 25, 2005 Team Agreement, defendants note that Mr. Gordo and Mr.

3   Burrow agreed to a covenant not to solicit, one year after their Smith Barney departure, customers

4   brought into Smith Barney by another financial advisor.  The covenant provides in pertinent part:

5       If, at any time, any FC [financial consultant] who is a party to this Agreement resigns
        from SB . . . such FC agrees that for a period of one year following his/her termination,
6       he/she will not solicit, by mail, by telephone, by personal meeting, or by any other means,
        either directly or indirectly, any account introduced to the Joint FC Number by any other
7       FC . . .

8   Similar to its counterpart in the Joint Production Agreements, the covenant not to solicit in the Team

9   Agreement addresses accounts brought by financial consultants other than Mr. Gordo and Mr. Burrow.

10  Smith Barney fails to substantiate that the Joint Production and Team Agreements preclude Mr. Gordo

11  and Mr. Burrow to solicit accounts, i.e, clients, which they brought to Smith Barney.

12     Nonetheless, inquiry into preclusion to solicit Mr. Gordo and Mr. Burrow's clients does not end

13  with the Joint Production and Team Agreements.  In his 2001 Trainee Agreement, Mr. Gordo agreed to

14  use information of any account, customer or prospect for the "sole purpose" of conducting Smith Barney

15  business and "not to divulge or disclose this information to any competitor."  Mr. Gordo acknowledged

16  that such information deserves "trade secret status."  Pursuant to the Trainee Agreement's non-

17  solicitation clause, Mr. Gordo agreed "for a period of one year following my termination I will not solicit

18  . . . any Account whom I served or whose name became known to me during my employment at

19  Salomon Smith Barney in any office and in any capacity."  Mr. Gordo agreed not to invite, encourage

20  or request an Account to transfer from Smith Barney, to open a new account with Mr. Gordo or his new

21  employer, or otherwise discontinue patronage and business relationship with Smith Barney.  In a

22  November 29, 2001 Account Referral/Assigned Lead Agreement, Mr. Gordo agreed during one year

23  after his Smith Barney departure not to solicit customers assigned to him or brought to Smith Barney

24  by another financial advisor.

25     Mr. Gordo and Mr. Burrow agreed to comply with policies in the Smith Barney employee

26  handbook, including during one year following separation from Smith Barney, not to solicit "any client

27  or customer of [Smith Barney] or its affiliates, whose account(s) you served or whose name you learned

28  during your association with [Smith Barney]."

14

1    Defendants contend that non-solicitation provisions in Smith Barney's "non-negotiable

2  employment agreements" are void under California Business and Professions Code section 16600

3  ("section 16600"), which provides in part that "every contract by which anyone is restrained from

4  engaging in a lawful profession, trade, or business of any kind is to that extent void." Defendants

5  acknowledge exceptions to restraints on trade, including narrow restraint on competition and necessary

6  restraint to protect trade secrets and to prevent unfair competition. The California Supreme Court has

7  construed section 16600 to invalidate contracts not to compete, "except where their enforcement is

8  necessary to protect the trade secrets of an employer." *Gordon Termite Control v. Terrones*, 84

9  Cal.App.3d 176, 178, 148 Cal.Rptr. 310 (1978) (citing *Muggill v. The Reuben H. Donnelly Corp.,* 62

10  Cal.2d 239, 242,42 Cal.Rptr. 107, 398 P.2d 147 (1965)).

11    In his 2001 Trainee Agreement, Mr. Gordo agreed that Smith Barney's records are "confidential"

12  and its "sole and exclusive property." Mr. Gordo agreed that Smith Barney's "information is developed

13  and acquired by great expenditures of time, effort and money" and deserves "trade secret status and

14  protection." Mr. Gordo agreed not to use Smith Barney information "except for the sole purpose of

15  conducting business" on Smith Barney's behalf. Mr. Gordo further agreed "not to divulge or disclose

16  this information to any competitor" of Smith Barney. As to Mr. Burrow, Smith Barney relies on the

17  Joint Production and Team Agreements, which limit non-solicitation of clients brought to Smith Barney

18  by other financial advisors.

19    Near the time of their resignations, Mr. Gordo and Mr. Burrow took more than client names,

20  addresses, phone numbers, e-mail addresses and account titles. Since the TRO, Mr. Gordo and Mr.

21  Burrow have returned materials sought by Smith Barney and have averred that they have returned all

22  matters subject to the TRO and April 18 TRO. Detriment to Smith Barney from alleged taking of

23  excessive information appears negated. Nothing before this Court suggests that defendants withhold

24  matters subject to the TRO and April TRO. A further order to require defendants to turn over additional

25  matters, including USB thumb drives, is unwarranted in the absence of evidence to challenge Mr. Gordo

26  and Mr. Burrow's credibility.

27    As to solicitation of Smith Barney clients, Smith Barney points to no agreement which Mr.

28  Burrow breached to solicit **his** clients. There is no definitive evidence that he solicited Smith Barney

clients other than his own.  As to Mr. Gordo, the Trainee Agreement precludes him to solicit his Smith

Barney clients.  However, the Trainee Agreement precedes the Protocol, which permits Mr. Gordo to

solicit his Smith Barney clients.  Smith Barney fails to explain how the Trainee Agreement and other

agreements nullify the Protocol and relies on Valley Wealth's delay to no later than March 18, 208 to

become a Protocol member.  Such delay after Mr. Gordo and Mr. Burrow's resignations is unavailing,

especially given that defendants have been subject to the TRO since March 18, 2008.  Based on the

current status of matters, including the Protocol, Smith Barney fails to substantiate probable success on

breach of employment agreement claims.

### *Trade Secrets*

Defendants contend that client names, addresses and phone numbers are not trade secrets or

confidential. A customer list acquired by lengthy and expensive efforts deserves protection as a trade

secret.  *See MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 521 (9th Cir. 1993), *cert. denied*,

510 U.S. 1033, 114 S.Ct. 671 (1993) (customer database qualifies as a trade secret because it has

potential economic value to allow a competitor to direct its sales efforts to potential customers);

*Courtesy Temporary Service, Inc. v. Camacho*, 222 Cal.App.3d 1278, 1288, 272 Cal.Rptr. 352 (1990)

(trial court's refusal to grant injunctive relief as to customer information was abuse of discretion).

California has enacted the Uniform Trade Secrets Act ("UTSA"), and California Civil Code section

3426.1 defines a trade secret in part as "a formula, pattern, compilation, program, device, method,

technique, or process, that: . . . [d]erives independent economic value, actual or potential, from not being

generally known to the public or to other persons who can obtain economic value from its disclosure or

use."

Smith Barney notes that California courts are open to protect customer lists:

> Trade and business secrets and confidential information are the property of the employer
> and cannot be used by the employee for his own benefit. A list of subscribers of a
> service, built up by ingenuity, time, labor and expense of the owner over a period of
> many years is property of the employer, a part of the good will of his business and, in
> some instances, his entire business. Knowledge of such a list, acquired by an employee
> by reason of his employment, may not be used by the employee as his own property or
> to his employer's prejudice.

*Greenly v. Cooper,* 77 Cal.App.3d 382, 392, 143 Cal.Rptr. 514 (1978)); *see American Credit Indemnity*

*Co. v. Sacks*, 213 Cal.App.3d 622, 631, 262 Cal.Rptr. 92 (1989) (trial court erred to deny injunction in

that plaintiff's "customer list was 'information' which has potential economic value because it allows a competitor to direct sales efforts to the elite 6.5 percent of those potential customers"); *see also MAI Systems*, 991 F.2d at 521 (customer database qualifies as a trade secret because it has potential economic value to allow a competitor to direct its sales efforts to potential customers).

In *Thompson v. Impaxx, Inc.*, 113 Cal.App.4th 1425, 1432, n. 3, 7 Cal.Rptr.3d 427 (2003), the California Court of Appeal explained:

> For instance, *Morlife* observed that "courts are reluctant to protect customer lists to the extent they embody information which is 'readily ascertainable' through public sources, such as business directories. [Citations.] On the other hand, where the employer has expended time and effort identifying customers with particular needs or characteristics, courts will prohibit former employees from using this information to capture a share of the market. . . . As a general principle, the more difficult information is to obtain, and the more time and resources expended by an employer in gathering it, the more likely a court will find such information constitutes a trade secret. [Citation.]" (*Morlife*, supra, 56 Cal.App.4th at pp. 1521-1522, 66 Cal.Rptr.2d 731.) Those are the kinds of facts which are relevant to the question.

Smith Barney explains that its customer list resulted from "substantial expenditures," including "millions of dollars spent annually on advertising, marketing and promotional campaigns; seminars; research and development; purchase of mailing lists and other customer leads; and many other services provided, and expenses incurred by, Smith Barney, in the development and servicing of its customers."

Defendants contend that records of client names, addresses and account information are not trade secrets since defendants developed and facilitated such relationships personally and established a business rapport sufficient to solicit clients after Mr. Gordo and Mr. Burrow's resignations. Defendants note that "in the absence of a protectable trade secret, the right to compete fairly outweighs the employer's right to protect clients against competition from former employees." *American Credit Indemnity*, 213 Cal.App.3d at 634, 262 Cal.Rptr. 92. Defendants point to *Morgan Stanley v. Frisby*, 163 F.Supp.2d 1371, 1378 (N.D. Ga. 2001), where another district court applied Georgia's adoption of the UTSA to determine that Morgan Stanley's client information was not subject to trade secret protection:

> A review of the standard and customary practice of the securities industry, as well as of Morgan Stanley's own corporate practice, demonstrates that the clients and client information at issue here are not proprietary to Morgan Stanley, nor are they sufficiently "secret" for trade secret protection. When Morgan Stanley hires brokers from its competitors, it takes the completely opposite position as it has in the present case. Morgan Stanley vigorously defends the same hiring practices it challenges here and admits that the client information at issue is not a trade secret.

17

Moreover, defendants challenge Smith Barney's protection of confidential information in that under the Protocol, Smith Barney permits departing financial advisors to take client information. Defendants point to the following from *Smith Barney v. Griffin*, 23 Mass.L.Rptr. 457, regarding a departing Smith Barney financial advisor:

> Under the Protocol, Smith Barney permits Client Information to be freely taken by departing financial advisors who leave for another signatory financial institution, even though this information is characterized as confidential information in its Contract with [departing financial advisor] Griffin. . . . Smith Barney cannot have it both ways – it cannot declare this information to be confidential and, at the same time, permit this information freely to be taken to 38 other financial institutions by departing advisors.
>
> . . .
>
> . . . Smith Barney has implicitly recognized that there is an alternative way to protect its good will when a financial advisor leaves for another firm – promptly identify the clients of the departed financial advisor and seek to persuade them to stay.  The Protocol requires the departing financial advisor to identify the Client Information she is taking, the same information that Griffin provided . . . Presumably, the reason for this disclosure is to permit the financial institution to act quickly to contact those clients itself.

Given the Protocol, Smith Barney is hard pressed to convince this Court that information regarding clients whom Mr. Gordo and Mr. Burrow serviced qualify as Smith Barney's confidential trade secrets.  Mr. Gordo and Mr. Burrow built up their clientele through their efforts.  Smith Barney provides little evidence that it or other financial advisors provided clients to Mr. Gordo and Mr. Burrow.  In fact, Mr. Burrow notes that he brought, and was encouraged to bring, his existing clientele to Smith Barney. *See Frisby*, 163 F.Supp.2d at 1377 ("equity estops Morgan Stanley from challenging Defendants' transition to PaineWebber because Morgan Stanley actively hires brokers from competitors and encourages them to use their client information to solicit account transfers.")  Smith Barney fails to pinpoint that its "substantial expenditures" were directed to Mr. Gordo and Mr. Burrow's clients.  Smith Barney acknowledges that it purchases "mailing lists," i.e., public information to develop clientele. Although Smith Barney is entitled to protection of information of clients whom Mr. Gordo and Mr. Burrow did not service, Smith Barney fails to substantiate it is entitled to seclude information as to Mr. Gordo and Mr. Burrow's clients.

### *Unfair Competition*

Smith Barney argues that defendants' conduct constitutes unfair competition in that Mr. Gordo and Mr. Burrow took Smith Barney's client information to treat Smith Barney's clients as their own.

18

Smith Barney points to the following from *Ojala v. Bohlin*, 178 Cal.App.2d 292, 301, 2 Cal.Rptr. 919 (1960):

> The scope of unfair competition may not be limited to a particular type of deception. The legal concept of unfair competition has evolved as a broad and flexible doctrine with a capacity for further growth to meet changing conditions, and there is no complete list of the activities which constitute unfair competition. . . . It is self-evident that the misuse of confidential information in breach of trust and in competition with the trustor would be unfair competition.

Smith Barney fails meaningfully to substantiate its unfair competition claims. The record before this Court indicates that Mr. Gordo and Mr. Burrow pursued clients whom they had serviced and developed while at Smith Barney. Smith Barney's signing the Protocol indicates that it expected outgoing financial advisors to continue to service their clients and that such continuing service is not unfair competition. Smith Barney overplays its claims of deception.

### *Wrongful Conversion Of Smith Barney Property*

Smith Barney contends that Mr. Gordo and Mr. Burrow wrongfully took its property, including computers and hard copies of confidential client records to entitle Smith Barney to further injunctive relief to relinquish immediately unreturned Smith Barney property. Smith Barney points to California Labor Code section 2860, which provides: "Everything which an employee acquires by virtue of his employment, except the compensation which is due to him from his employer, belongs to the employer, whether acquired lawfully or unlawfully, or during or after the expiration of the term of his employment."

Defendants have turned over detailed materials to Smith Barney. Based on the record, this Court is left to speculate as to specific property which Smith Barney claims may not have been returned. Although Mr. Burrow transferred files from his laptop to USB thumb drives, Mr. Burrow avers that "I did not move, remove, transfer, delete of even see any Smith Barney property." Mr. Kautzman, Valley Wealth's IT person, examined Mr. Burrow's thumb drives and averred that they are "files of a personal nature, including personal financial information, or Valley Wealth business information, including business plan, company financials, budgets; there were no Smith Barney files or information on Mr. Burrow's thumb drive." Smith Barney offers nothing to challenge meaningfully defendants' contentions that they retain no Smith Barney property. Smith Barney will need to rely on discovery to flush out a

19

1   claim that defendants retain Smith Barney property and trade secrets.

2

3   ### Breach Of Fiduciary Duty

4   _____Smith Barney takes the position that Mr. Gordo and Mr. Burrow breached their fiduciary duty

5   of loyalty to act in Smith Barney's best interests by misappropriating Smith Barney's property and

6   aggressively soliciting its clients.  Smith Barney claims that Mr. Gordo and Mr. Burrow used Smith

7   Barney's financial and human resources to copy confidential client information prior to their

8   resignations.

9       "[A]n employee may not transfer his loyalty to a competitor." *Stokes v. Dole Nut Co.*, 41

10  Cal.App.4th 285, 295, 48 Cal.Rptr.2d 673 (1995).  "During the term of employment, an employer is

11  entitled to its employees' 'undivided loyalty.' " *Fowler v. Varian Associates, Inc.,* 196 Cal.App.3d 34,

12  41, 241 Cal.Rptr. 539 (1987).  An "employer has the right to expect the undivided loyalty of its

13  employees. The duty of loyalty is breached, and may give rise to a cause of action in the employer, when

14  the employee takes action which is inimical to the best interests of the employer." *Stokes*, 196

15  Cal.App.4th at 295, 48 Cal.Rptr.2d 673.

16      As noted above, Smith Barney's participation in the Protocol diminishes its claims that Mr.

17  Gordo and Mr. Burrow breached duties of loyalty, especially given that Smith Barney presumably

18  benefitted from Mr. Burrow's transfer of his Morgan Stanley clients to Smith Barney.  At most,

19  defendants and Smith Barney compete on a limited scale in a limited market.  Defendants do not

20  compete with Smith Barney in the national market to which it is privy.  Clients are free to come and go

21  among defendants, Smith Barney and a myriad of other financial advisors.

22      In sum, Smith Barney has failed to demonstrate sufficient success on the merits of its claims to

23  satisfy that element for a preliminary injunction.

24  ### Irreparable Injury

25      Smith Barney argues that Mr. Gordo and Mr. Burrow's aggressive solicitation of its clients has

26  caused irreparable injury which cannot be remedied by money damages.  Smith Barney points to

27  irreparable harm of incalculable damages, loss of client confidentiality and threatened office instability.

28      Smith Barney contends that measurement of its damages is beyond reasonable certainty.  Smith

1    Barney points to *Merrill Lynch v. Stidham*, 658 F.2d 1098, 1102, n. 8 (5th Cir. 1981), a case of

2    misappropriation of trade secrets where the Fifth Circuit Court of Appeals commented: "Were

3    defendants permitted by the law to exploit the clientele of their former employers, every investment that

4    reasonably flowed from the exploitation should be included in the damages award. How such a figure

5    could be arrived at escapes us." Smith Barney claims inability to determine the "number of Smith

6    Barney clients who will be pirated away by the Defendants" and commissions such clients will generate

7    well into the future.

8          Smith Barney points to further alleged irreparable harm from loss of reputation and undermining

9    clients' expectations that their financial information, transactions and assets will remain with Smith

10   Barney and not disclosed to outsiders. Smith Barney argues that "misappropriation" of private financial

11   information "causes clients to lose faith in the integrity and professionalism of the financial institution

12   to whom they have entrusted their investments." Smith Barney points to the loss of a client after she

13   received a notebook and letter from defendants.

14         Defendants respond that Smith Barney has sufficient legal remedies in that "losses allegedly

15   suffered by Smith Barney, as a result of the loss of an employee in the financial services industry, can

16   be compensated with monetary damages." Defendants argue that Smith Barney's damages should not

17   be great given its large size and prominence in the financial community. Defendants point to the

18   comments of a fellow district court that "any loss of clients' business to Merill Lynch may be adequately

19   redressed with money damages. . . . The real loss which might be suffered by Merill Lynch comes in

20   the form of commission revenue generated by the Defendant from former Merill Lynch customers, and

21   that can readily be calculated from the commissions her and her new firm derive from the old Merill

22   Lynch customers." *Merrill Lynch v. McCullen*, 1995 WL 799537, at *3 (S.D. Fla. 1995). In addressing

23   Protocol effects as to irreparable harm, another district court recently observed "Merill's [Protocol]

24   signature indicates that they understand the fluid nature of the industry; brokers routinely switch firms

25   and take their client lists with them. By setting up such a procedure for departing brokers to take client

26   lists, Merill tacitly accepts that such an occurrence does not cause irreparable harm." *Merrill Lynch v.*

27   *Brennan*, 2007 WL 632904, at *2 (N.D. Oh. 2007).

28         Courts have become disinclined to find irreparable, incalculable harm from financial advisors'

1   departures.  In pursuit of its claims, Smith Barney may seek compensation for proven economic harm

2   resulting from Mr. Gordo and Mr. Burrow's departures and subsequent conduct.  As the record stands,

3   irreparable harm is not apparent to support the broad preliminary injunction Smith Barney seeks.

4   **Balance Of Equities And Public Interest**

5   Smith Barney notes that it seeks a return to the status quo to require defendants to return Smith

6   Barney's "wrongfully diverted" confidential data and to preclude defendant's further solicitation of

7   Smith Barney clients.  "Not only should the employee be enjoined from the solicitation of his former

8   customers, but the court's order should prohibit the new employer from obtaining the benefits of such

9   an unfair practice, thereby making the remedy of the former employer effective and complete."  *George*

10  *v. Burdusis*, 21 Cal.2d 153, 163, 130 P.2d 399 (1942).  Smith Barney points out that a preliminary

11  injunction will protect its goodwill, business reputation, trade secrets, business methods operation,

12  contract rights, coveted client list, and client records confidentiality.  Smith Barney notes that defendants

13  "have deliberately breached their contractual commitments and misappropriated Smith Barney's trade

14  secret property" to contravene Smith Barney's interest.

15  Defendants respond that they have "but one book of business" for which they have spent much

16  time and money to build and service.  Defendants contend that Smith Barney's requested injunction

17  would be "devastating" and disproportional given Smith Barney's heavy weight status in the financial

18  industry.  "Brokerage firms can survive the denial of an injunction far more readily than their departing

19  employees can survive its issuance."  *Frisby*, 163 F.Supp.2d at 1381.

20  As to public interest, defendants argue that injunctive relief is a disservice to "the interests of

21  customers whose accounts and need for financial advice are at issue."  "A broker-client relationship, like

22  a lawyer-client or doctor-patient relationship, is a personal relationship dependent on personal trust.

23  Clients should be free to deal with the broker of their choosing and not subjected to the turnover of their

24  accounts to brokers associated with the firm but unfamiliar to the client, unless the client gives informed

25  consent to the turnover."  *Prudential Securities v. Plunkett*, 8 F.Supp.2d 514, 520 (E.D. Va. 1998).

26  Defendants conclude that public interest weighs in favor of open competition.

27  There is no doubt that Smith Barney is a giant in the securities field.  Defendants are a start up

28  firm in a mid-sized community.  This Court agrees with defendants that Smith Barney's requested relief

1    would be devastating and potentially wipe out defendants.  Smith Barney offers nothing meaningful that

2    defendants will not be harmed more than Smith Barney is helped.  Moreover, the public interest is better

3    served with open competition in the securities field and access to advisors of clients' choice.  The

4    balance of equities and public interest factors weigh in defendants' favor.

5                                                **CONCLUSION AND ORDERS**

6            Based on the record, this Court DENIES the broad preliminary injunction sought by Smith

7    Barney.  Defendants are entitled to solicit and service clients whom Mr. Gordo and Mr. Burrow

8    primarily serviced at Smith Barney.  However, Mr. Gordo and Mr. Burrow agreed to covenants not to

9    solicit, for a year after their departure, clients brought to Smith Barney and serviced primarily at Smith

10   Barney by other advisors.  Such covenants appear enforceable on the record before this Court.  As such,

11   defendants Jason Gordo, Jeff Burrow, and Valley Wealth, Incorporated, and all persons acting under,

12   in concert with, or for them, including, but not limited to, any officer, agent, representative or employee

13   of Valley Wealth, Incorporated, are restrained and enjoined from soliciting business from, or initiating

14   any contact or communication with any Smith Barney client or customer who were brought to Smith

15   Barney or serviced primarily at Smith Barney by other advisors.  Such prohibition expires March 7,

16   2009.

17           Turning to Smith Barney property and trade secrets, the record indicates that defendants have

18   returned to Smith Barney any materials which qualify as Smith Barney property and no longer possess

19   information which qualifies as trade secrets and to which defendants are not entitled.  Smith Barney fails

20   to challenge meaningfully defendants' averments that they have complied with the TRO and April 18

21   TRO.  Further requirements to turn over materials, computers, USB thumb drives or related matters is

22   unwarranted unless discovery demonstrates otherwise.  In light of this order, this Court VACATES the

23   TRO and April 18 TRO.

24           IT IS SO ORDERED.

25   **Dated:    May 16, 2008**                    _____/s/ Lawrence J. O'Neill_____
                                                                     UNITED STATES DISTRICT JUDGE
26

27

28

                                                            23